# *Ex parte* Dement.

## *Certiorari.*

*Expert; physician may be compelled to testify as, without being paid as for professional opinion.*—A physician, like any other person, may be called to testify as an expert in a judicial investigation, whether it be of a civil or criminal nature, without being paid for his testimony as for a professional opinion; and upon refusal to testify, is punishable as for a contempt.

Application for *certiorari*, &c., showing the following state of facts: One Kit Barnard was on trial in the circuit court of Madison, on a charge of murder. Dr. J. J. Dement, the petitioner, was introduced as a witness for the State, the solicitor stating that he desired to examine him as an expert. After testifying that he was a physician and had seen the deceased after he had received the wounds which the prosecution asserted had produced death, he was asked to state the nature and character of the wound received, and its probable effect. This, Dr. Dement declined to do, upon the ground that "he had not been remunerated for his professional opinion, nor had compensation for his professional opinion been promised or secured." The court informed the witness that it was his duty to answer, and upon his declining to do so, imposed a fine of five dollars for contempt of court.

Afterwards the petitioner moved to have the fine set aside on the ground that it was illegal, the court not having power to compel the petitioner to testify as professional expert until compensation for his professional opinion was first paid or secured.

The court overruled this motion and judgment for the fine was entered accordingly. This judgment entry recites the facts constituting the contempt as above stated, and the petitioner also reserved a bill of exceptions.

BRANDON & JONES, for petitioner.—There is quite a difference between compelling a physician to testify to a fact which he has witnessed, and forcing him to appear merely to give the results of his peculiar skill and experience—or, in other words, under guise of calling him as an expert, to compel him to give professional opinions, without being paid for them as such. To hold otherwise, subjects the professional man to unjust burdens, and makes improper discriminations against him. When a physician appears merely to

*[Ex parte Dement.]*

testify to what he has seen or knows individually, he does only what any other citizen can be compelled to do; but when he has no actual knowledge of any fact in the case, and is nevertheless forced to testify without being paid as for a professional opinion, his skill and knowledge, which are his private property, are taken from him without compensation. 1 Sprague, 276; Elwell's Med. Jur. 592–3; Ordronaux Med. Jur. § 113; 3 Indiana, 497; 1 Brod. & Bing, 515; 5 M. & S. 156; 9 Cal. 178; Redfield on Wills, chap. 4, § 15.

MANNING, J.—The question presented in this cause is whether a physician is punishable as for a contempt for refusing to testify as an expert, without being paid for his testimony as for a professional opinion.

In Best's "Principles of the Law of Evidence," a philosophic English treatise (the 6th London edition of which was issued last year, and has been recently published in this country), he says: "The law allows no excuse for withholding evidence which is relevant to the matters in question before its tribunals, and is not protected from disclosure by some principle of legal policy. A person, therefore, who, without just cause, absents himself from a trial at which he has been duly summoned as a witness or a witness who refuses to give evidence, or to answer questions which the court rules proper to be answered, is liable to punishment for contempt. An exception exists in the case of the Sovereign, against whom, of course, no compulsory process of any kind can be used." In a note to this paragraph, referring to a passage in a work of Jeremy Bentham, Mr. Best says: "The following case has been put in illustration of the universality of this rule: 'Were the Prince of Wales, the Archbishop of Canterbury and the Lord High Chancellor to be passing in the same coach, while a chimney-sweeper and a barrow-woman were in dispute about a half-penny worth of apples, and the chimney-sweeper and the barrow-woman were to think proper to call upon them for their evidence, could they refuse it? No! most certainly not.'" Nothing is said in this work in relation to the exemption of physicians or other men of science.

In *Collins* v. *Godefroy* (1 B. & Ad. 950), in the court of kings' bench, England, the plaintiff, an attorney, having attended six days on subpœna as a witness for defendant in a civil cause, to testify in respect to negligence and unskilfulness in the conduct of an action by another attorney, and not being called to testify, sued for six guineas as his regu-

[*Ex parte* Dement.]

lar fees for attendance. There was some evidence also of a consent to pay this sum. The counsel for Collins, the attorney, insisted that this was different from the case of an indictment for a felony or a misdemeanor, in the prosecution of which the public may have an interest, and that in such a case it might be the duty of every person, duly called upon, to give his evidence. "But," he said, "a party who attends a court of justice to give his evidence in a civil cause, does it not in discharge of a public duty, but to confer a benefit on an individual ; and if he sustains a loss thereby as every professional man must, he ought to have a reasonable compensation for that loss." He referred to several prior cases and to the practice, as supporting his proposition. Lord TENDERDEN, C. J., delivering, after advisement, the opinion of the whole court, said : "If it be a duty imposed by law, upon a party regularly subpœnaed to attend from time to time to give his evidence, then a promise to give him any remuneration for loss of time incurred in such attendance is a promise without consideration. We think such a duty is imposed by law ; and . . . . we are all of opinion that a party cannot maintain an action for compensation for loss of time in attending a trial as a witness. We are aware of the practice which has prevailed in certain cases, of allowing as costs, between party and party, so much per day for the attendance of professional men, but that practice cannot alter the law. What the effect of our decision may be is not for our consideration," &c. This deliberate and unanimous decision of the high court of king's bench, adverse to the claim, was made in 1831.

In the court of common pleas, in the same year, PARK, J., in respect to a similar question, said : "In *Moor* v. *Adam* it was stated that upon process in this country, allowance for time is made only to medical men or attorneys, a rule which appears to be hard and partial ; for time to a poor man is of as much importance as to an attorney." And TINDAL, C. J., said : "If that rule were to undergo revision, I cannot say it would stand the test of examination. There is no reason for assuming that the time of medical men and attorneys is more valuable than that of others whose livelihood depends on their own exertions." *Lonergan* v. *Royal Exchange Assurance*, 7 Bingh. 731. Afterwards, in 1843, in a *nisi prius* case, *Webb* v. *Page*, (1 Carr. & Kirw. 23) a witness who was called for plaintiff, to speak as to damage done to some furniture, and the expense necessary to repair or restore the injured articles, before being sworn applied for compensation for his loss of time. MAULE, J., held ; "There

[*Ex parte* Dement.]

is a distinction between the case of a man who sees a fact, and is called to prove it in a court of justice, and that of a man who is selected by a party to give his opinion about a matter with which he is peculiarly conversant from the nature of his employment in life. The former is bound as a matter of public duty to speak to a fact which happens to have fallen within his knowledge. Without such testimony the course of justice must be stopped. The latter is under no such obligation. There is no such necessity for his evidence, and the party who selects him must pay him." It is said that one or more other like decisions have been made by judges on the circuit in England, but we have no report of them, if there be any, within our reach here. The case in which the reasons for such a ruling are best expressed, is *In the matter of Roelker*, in the district court of the United States for Massachusetts—Sprague's Decisions, 276. During a trial, upon an indictment, the district attorney moved for a *capias* against Roelker, a German, who had been summoned to act as an interpreter of the testimony of some German witnesses, and had neglected or refused to attend. SPRAGUE, J., said: "A similar question has heretofore arisen as to experts, and I have declined to issue process to arrest in such cases. When a person has knowledge of any fact pertinent to an issue to be tried, he may be compelled to attend as a witness. In this all stand upon equal ground. But to compel a person to attend merely because he is accomplished in a particular science, art, or profession, would subject the same individual to be called upon in every cause in which any question in his department of knowledge is to be solved. Thus, the most eminent physician might be compelled, merely for the ordinary witness fees, to attend from the remotest part of the district, and give his opinion in every trial in which a medical question should arise. . . . . The case of an interpreter is analogous to that of an expert. It is not necessary to say what the court would do, if it appeared that no other interpreter could be obtained by reasonable effort. Such a case is not made as the foundation of this motion. It is well known that there are in Boston many native Germans and others skilled in both the German and English languages, some of whom, it may be presumed, might without difficulty be induced to attend for an adequate compensation." The head notes, prepared by Judge SPRAGUE himself, to this case, are as follows: "The court will not compel the attendance of an interpreter, or expert, who has neglected to obey a *subpœna*, unless in case of necessity. *Semble.* That a person may be compelled to attend as an

[*Exparte* Dement.]

interpreter, in case no other can be obtained to perform that office." These are all the *decisions* we have found that shed light on the question involved. And those in England were influenced by the statute on the subject of 5 Eliz. Ch. 9, which enacts that the witness must "have tendered to him according to his countenance, or calling, his reasonable charges." But in this country, as Mr. Greenleaf says (1 Ev. 12th Ed. § 310), "these reasonable expenses are settled by statutes at a fixed sum for each day's actual attendance and for each mile's travel from the residence of the witness to the place of trial and back, without regard to the employment of the witness or his rank in life." See also Revised Code, §§ 2783, 4220 and 4015 to 4021.

We have quoted so largely from the opinions of courts in causes before them, to be adjudicated, partly because it was desirable it should be known what was actually decided, and partly because of the interest taken in the question by gentlemen of the medical fraternity. They have been led into some error on the subject by the misconceptions of writers whose works relating to medical jurisprudence, are properly found in their libraries as well as in those of lawyers.

It will be noticed that it has not been adjudged in any of the cases cited, that a physician or other person examined as an expert is entitled to be paid for his testimony as for *professional opinions*.

The reports contain nothing to this effect. The English cases only indicate, and it is implied by the decision of Judge SPRAGUE, that persons summoned to testify as experts ought to receive compensation for their *loss of time*. And it is to be inferred that the judges delivering some of the opinions thought the time of such a witness ought to be valued, in the language of the English statute, "according to his countenance and calling." But it is not intimated by any of them, that a physician, when testifying, is to be considered as exercising his skill and learning in the healing art, which is his high vocation; or that a counsellor at law, in the same situation, is exerting his talents and acquirements in professionally investigating and upholding the rights of a client. If this were so, each one should be paid for his testimony as a witness, as he is paid by clients, or patients, according to the importance of the case and his own established reputation for ability and skill. But, in truth, he is not really employed or retained by any person. And the evidence he is required to give should not be given with the intent to take the part of either contestant in the suit,

but with a strict regard to the truth, in order to aid the court to pronounce a correct judgment.

Perhaps the attitude of one testifying as an expert of a matter in respect to which he is made conversant or skilled by his ordinary employment, is not so different as is supposed, from that of another who testifies to acts or things done by or between the parties to a cause. It generally happens that after all the direct facts of a transaction are brought before a court, a knowledge of other facts, not part of the dealing or affair between the litigants, is necessary to a proper understanding and decision thereupon. For instance, one man may contract to sell and deliver to another, on a certain future day, for a price agreed on, a specified quantity of a valuable commodity, and afterwards fail or refuse to do so, and thereupon be sued by the latter. Witnesses to the agreement between them, must be produced to prove the contract, of course—but when this is fully done, it must be further shown to the court and jury what was the value of the commodity on the day and at the place where it was to be delivered ; else it cannot be known what sum of money would be an adequate compensation for the breach of the contract. And to prove this value, it may be necessary to call in some person who was living at that place at that time, and a dealer in commodities of the same kind, who did not know, and had never before heard of, the parties to the cause. Or, if the contract supposed was made in a country foreign from that in which the suit was brought, and it depended upon the laws of that foreign country whether it was valid or not, the court would need to be informed what its laws were concerning the making of such a contract, that it might know whether or not it was validly made. And if lawyers of that country were within the jurisdiction of the court, it might be necessary to have the testimony of one or more of them to prove what those laws were. Or, if the contract was made and to be performed in a place of much trade, and contained terms having a peculiar but well established meaning according to the usage and dealings among persons engaged in that trade, which meaning it was important to have proved, merchants, or persons engaged therein, would have to be brought before the court to prove the usage and meaning, just as an interpreter would be called in to translate writings in a foreign language.

In all these instances, persons who may be wholly unacquainted with the parties to a cause, and know nothing of the transactions between them, may be required to come from their offices and the care of their own important affairs, into

[*Ex parte* Dement.]

court to testify for the benefit of strangers, in regard to matters in which they have themselves become conversant only by attending to their own business. And why are they required to do so? Because they know things important to the right determation of a controversy pending. And, in the language quoted at the commencement of this opinion,  "The law allows no excuse for withholding evidence which is relevant to the matters in question before its tribunals, and is not protected from disclosure by some principle of legal policy"; and because, also, as is well said in regard to *ordinary* witnesses—in Ordroneaux's "Jurisprudence of Medicine"—"The administration of justice being a source of mutual benefit, to all the members of the community, each is under obligation to aid in furthering it, as a matter of public duty. As an *ordinary* witness, or a juror, every competent citizen may be summoned by due process of law to appear, and render personal service in court, without right on his part to a special compensation for so doing. His time is, *quoad hoc*, claimed by the public as a tax paid by him to that system of laws which protects his rights as well as those of others." (Ed. of 1869, p. 138). But this acccomplished and learned writer does not sustain, with the authority of adjudged cases, the following subsequent passage in his work, to-wit: "It is evident that the skill and professional experience of a man, are so far his individual capital and property, that he cannot be compelled to bestow it gratuitously upon any party. Neither the public, any more than a private person, have a right to extort services from him in the line of his profession, without adequate compensation. On the witness stand, precisely as in his office, his opinions may be given or withheld at pleasure; for a skilled witness cannot be compelled to give an opinion, nor committed for contempt, if he *refuses to do so*. Whoever calls for an opinion from him in *chief* is under obligation to remunerate him, since he has to that extent employed him professionally; and the expert at the outset may decline giving his opinion, until the party calling him either pays or agrees to pay him for it." The first two sentences above quoted are probably correct as general propositions. And the same might be as truly said of the time and knowledge of other persons. But, the *exception* in favor of experts thus contended for, against the general rule relating to witnesses, is not established; and other passages in the same work indicate reasons why, until the legislature make provision for the compensation of experts, the courts must, in a manner that shall be as little oppressive as possible, insist, on proper

[*Ex parte* Dement.]

occasions, upon their attending and testifying as ordinary witnesses. Thus, the author truly says: "As all definite knowledge springs from the possession of facts corroborating previous conjectures, so evidence is the expression of a necessity of the human mind for all such facts as will enable it to form a conclusive judgment. Without evidence, therefore, there can be no knowledge; and in order to secure it, the law seeks for testimony either through the mouths of living witnesses, the agency of written instruments, material objects and surrounding circumstances, or expressions of opinions predicated upon an acknowledgod state of facts." And again he says in relation to *experts* when testifying as witnesses: "They are truly advisers of the court, *amici curia*, rather than parties interested in the issue of the trial." And he adds: "This fact, it is painful to confess, is too much ignored both by counsel as well as courts, and the expert is constantly apt to be treated like an interested party whose every word is tainted with the prejudice of a personal concern in the transaction." It may, however, be said of other witnesses also, that—in theory—they are disinterested, and *amici curiæ*. All witnesses should be so, whether testifying to the facts of a transaction that happened under their own observation, or to those natural laws and effects which are learned only by experiment and study. And we may add that a cross examination of those of the latter class must be allowed as well as of those of the former, in order that it may be ascertained (so far as by such means it may be), whether they do, indeed, so well and accurately know the matters and things about which they testify, and are so free from bias and partisanship toward the individuals concerned, or conflicting schools and theories, as to be wholly trustworthy witnesses. For, in fact, they all are witnesses at last. And the same principle which justifies the bringing of the mechanic from his work-shop, the merchant from his storehouses, the broker from 'change, or the lawyer from his engagements, to testify in regard to some matter which he has learned in the exercise of his art or profession, authorizes the summoning of a physician, or surgeon, or skilled apothecary, to testify of a like matter, when relevant to a cause pending for determination in a judicial tribunal. And if in a prosecution of an individual for murder, it was proved that his supposed victim had, a short time before his death, drank something which he had received from the accused, and a chemist had analyzed the liquid, and testified what substances it contained, and a physician was summoned to prove what effect they would have when taken into the stom-

[*Ex parte* Dement.]

ach of a living man, and what would be the symptoms of such effect, no court would be excusable in exonerating the physician from giving such evidence, solely on the ground that it would be a professional opinion for which he had not been paid, or received a promise of payment. In so testifying he would not be practicing the healing art; he would, like the merchant, or the lawyer, or the mechanic, before referred to, be deposing only to things which he had learned in the course of his occupation or profession, or of the preparation for it, and the disclosure of which, to the court, would conduce to a correct understanding of a cause before it. His testimony would concern the administration of justice. And of him, as of the other witnesses, it could be justly "claimed by the public, as a tax paid by him to that system of laws which protects his rights as well as others." The decisions of courts concern the property, reputation, liberty or lives of men, and are carried into execution as the judgments of the law. Every individual, high or low, is subject to them. It is, therefore, of vital public interest that the tribunals which pronounce these judgments shall have power to coerce the production of any relevant evidence existing within the sphere of their jurisdiction, requisite to prevent them from falling into error.

Nothing we have said is intended to support the proposition, that a physician or surgeon could be punished as for a contempt for refusing, unless paid therefor, to make a *post mortem* examination, or undertake any other operation, requiring skill and special professional training, in order to qualify himself, when desired by a court so to do, to testify in a cause. This question is not before us. And it is not probable that such a case will ever arise between judges of this State, and a profession so distinguished as that to which petitioner belongs, by liberal culture and a high sense of honor and duty. The case of *Gaston* v. *Marion County* (3 Ind. Rep. 497), where it was held that the county would be liable for such a service performed in Indiana at the request of a coroner there, touches that question—but none involved in this cause.

We infer from circumstances disclosed by this record, though it does not so expressly appear, that this was designed by petitioner to be a test case merely, on this subject. After a small fine was imposed upon him by the court, for refusing obedience to its requirement to testify, he did give his testimony, and the motion to set aside the fine afterwards, and refusal of the court to do so, were probably intended to present a case to be decided here.

[Lancaster v. The State.]

We find no error in the judgment of the court below, and it is, therefore, affirmed.